**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **ELIE RANDOLPH** | * | **CIVIL ACTION NO.** |
| **Individually and on** | * | |
| **Behalf of Others Similarly Situated** | * | |
| | * | |
| **VERSUS** | * | **JUDGE** |
| | * | |
| **NATIONSTAR MORTGAGE, LLC** | * | |
| **AND AMERICAN SECURITY** | * | **MAGISTRATE JUDGE** |
| **INSURANCE COMPANY** | * | |
| | * | |
| | * | **CLASS ACTION COMPLAINT** |
| | * | |
| * * * * * * * | * | |

## CLASS ACTION COMPLAINT

  **NOW INTO COURT,** through undersigned counsel, comes Plaintiff Elie Randolph, individually and on behalf of others similarly situated, who files this Class Action Complaint and avers the following:

## INTRODUCTION

  1. This is a proposed class action brought by Plaintiff Elie Randolph, ("Plaintiff") on behalf of himself and all other similarly situated homeowners who have or had residential mortgage loans originated and/or serviced by Nationstar Mortgage, L.L.C. between October 1, 2009 and the present (the "Class Period") and, in connection therewith, were required to pay for "force-placed" hazard insurance policies provided by American Security Insurance Company ("ASIC").

  2. The force-placed system set up by defendants places Nationstar and ASIC's financial interests in direct conflict with their duty to the plaintiff.

  3. In the event that a contractually required hazard insurance policy lapses, defendants commonly choose to replace borrowers' insurance policies with more expensive

ones, known as "force-placed" insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss.

4.      Moreover, these expensive polices are chosen even when more reasonably priced options, with greater coverage, are readily available.

5.      Upon information and belief, Nationstar has negotiated deals with ASIC, pursuant to which Defendant Nationstar receives a percentage of the cost of the premiums of each force-placed insurance policy purchased for a borrower. This commission or payback encourages the defendants to select an expensive insurance policy at the expense of the plaintiff and others similarly situated.

6.      In addition to purchasing its force-placed polices through ASIC, Nationstar has placed ASIC in charge of all insurance compliance issues for its borrowers.  ASIC is tasked with ensuring that properties have insurance as well as disbursing funds in escrow to pay for borrowers' insurance premiums.  This system creates an inherent conflict in that there is an incentive for ASIC to allow borrowers' hazard policies to lapse.  Further, Nationstar does not disclose this conflict, or even the existence of ASIC, to the borrowers whose loans it services.

7.      Plaintiff Randolph's claims demonstrate the danger faced by borrowers under this wholly unjust system.  Plaintiff always timely made his payment to the Nationstar.  It was the defendants that did not timely pay the premium for his hazard insurance.  Then, because of their own failure, defendants charged plaintiff for a force-placed policy that was 50% more expensive

and had less coverage than the one he had independently procured.  Additionally, the defendant purchased the policy in a manner that was contrary to Louisiana law.

8.     The financial gain for the defendants to issue a force-placed policy far exceeds the benefit it receives from accurately and diligently monitoring their borrowers' existing coverage.

9.     The actions of Defendants Nationstar and ASIC, and the force-placed system they have required thousands of homeowners to comply with, has garnered the attention of governmental entities at both the state and national level.  Recently, both companies were issued subpoenas by New York State's Department of Financial Services which is seeking information regarding their force-placed program.  http://www.americanbanker.com/issues/177_19/force-placed-insurance-subpoenas-probe-1046157-1.html?zkPrintable=1&nopagination=1.

10.     Additionally, force-placed insurance practices were a key component of a recent settlement between five mortgage servicers (Nationstar was not one) and the attorneys general from 49 states.  While the full settlement documents have not been released, a summary of the agreement shows the following requirements for force-placed policies:

- Banks/servicers shall not obtain force-placed insurance unless there is reasonable cause to believe a homeowner has not paid for property insurance.
- If a homeowner pays into an escrow account, the bank/servicer shall continue to advance payments to the insurer regardless of homeowner payment.
- The bank/servicer shall continue to make insurance payments if there is a lapse in payment and the payments are escrowed.
- Force-placed insurance must be purchased for a commercially reasonable price.

See Exhibit 1, p. 9-10, Servicing Standard Highlights from National Mortgage Settlement website.  The Servicing Standard Highlights and additional settlement documents can be found at www.nationalmortgagesettlement.com.

11.     The essence of the settlement agreement was to require entities such as Nationstar and ASIC to handle the payment of insurance premiums as a reasonable fiduciary should.

12.     Such action was necessitated as defendants and other servicers have stonewalled their borrowers, including Plaintiff Randolph, refusing to disclose the financial benefit that their system garners for them at the expense of their clients.  *See* Exhibit 2, Nationstar's Responses to Request for Admission No. 5, Civil Action No. 11-2165.

13.     In this action, plaintiff challenges, among other things and as further described herein, Nationstar'*s* decision to purchase force-placed hazard insurance from an insurer that provides a financial benefit to Nationstar and/or its affiliates and at rates that far exceed borrower-purchased hazard insurance while providing substantially less coverage.  While this insurer, ASIC, claims to monitor and maintain the existing hazard coverage of the Borrowers, in reality its system is set up so that homeowners like Randolph lose their normal coverage and then are charged for force-placed policies.

14.     Throughout the Class Period, defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) receiving fees, payments, commission, improper reinsurance premiums and/or other things of value from providers of force-placed insurance; (b) providing force-placed insurance from their own affiliates at a substantial, improperly high cost to the borrower; and (c) forcing borrowers to pay for unnecessary insurance.

15.     Defendant's unlawful actions include, *inter alia*, purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company without seeking competitive bids on the open market to maximize their own profits, backdating the force-placed policies to charge for retroactive coverage, and giving

4

and receiving "commissions" or "paybacks" for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of plaintiff and the absent Class members.

16.    In this action, plaintiff challenges defendants' unlawful conduct as violative of RESPA and seeks statutory damages.

17.    Plaintiff also asserts state law claims, as defendants violated Louisiana law, have breached their contractual obligations, including their implied covenants of good faith and fair dealing, owed to the plaintiff.

18.    Plaintiff and the other Class members maintain that defendants engaged in unfair, deceptive and/or fraudulent business practices as further described below.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

20.    This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff Randolph is a citizen of the State of Louisiana. Both defendants are citizens of different states than Plaintiff Randolph. The amount in controversy in this action exceeds $5,000,000.

21.    In addition, this Court has diversity jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states. This Court also has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in Plaintiff Randolph's mortgage loan transaction is located in

this district, Plaintiff Randolph resides in this district, defendants regularly conduct business in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**Plaintiff Elie Randolph**

23.     Plaintiff Elie Randolph resides in Harvey, Louisiana. On or about January 29, 2007, Mr. Randolph, obtained a $156,750 refinance mortgage loan from Flagstar Bank secured by his primary residence. *See* Randolph Mortgage, attached as Exhibit 3.  From the time that he entered into the new mortgage, Mr. Randolph has timely made his loan payments and never been in default.

24.     As a requirement of his loan, a portion of Mr. Randolph's monthly payment was placed in an escrow account controlled by the lender. The escrowed funds are to be used to make payments for, among other items, the hazard insurance policy on his home.

25.     On or about October 1, 2009 Defendant Nationstar began servicing Mr. Randolph's loan.  As part of its role as servicer of Mr. Randolph's loan, Nationstar assumed control over his escrowed funds and responsibility for making timely payments on his hazard insurance policy.

26.     Undisclosed to Mr. Randolph was the fact that a different company, ASIC, managed the escrow funds for Nationstar and was charged with timely making the payments on his hazard insurance policy.

27.     In connection with his mortgage loan, Mr. Randolph obtained a hazard insurance policy from GeoVera Specialty Insurance Company with an annual premium of $2,188.20. The policy provided the following coverage: (a) dwelling--$192,000; (b) other structures--$19,200;

(c) personal property--$96,000; (d) loss of use--$38,400. *See* Exhibit 4, attached hereto.  The policy expired on January 22, 2011 at 12:01 a.m.

28.     Mr. Randolph continued timely making his monthly mortgage payments to Nationstar, including payments that went into his escrow account.

29.     On a January 18, 2011 call between ASIC and GeoVera, ASIC received information regarding the renewal of Mr. Randolph's GeoVera policy, including the premium amount and the expiration date of January 22, 2011.  The January 18, 2011 call was made pursuant to an "open-items" policy of ASIC for insurance policies that were set to expire.  Under the "open-items" policy, the first call to the borrower, insurance agent or insurance company regarding the expiring policy is made between zero to twelve (12) days of the policy expiring.

30.     On January 19, 2011, ASIC claims to have remitted the renewal premium to GeoVera by standard U.S. Mail.  On January 22, 2011, the effective period of Mr. Randolph's GeoVera policy expired at 12:01 A.M.

31.     On January 24, 2011, a kitchen grease fire damaged the property.

32.     GeoVera's internal documents indicate that the renewal payment was not received until January 31, 2011.  Upon receipt of the renewal premium payment, GeoVera issued a new hazard insurance policy effective February 1, 2011.  However, GeoVera denied coverage for the fire because, it asserts, it only received Nationstar's check dated January 19, 2011, on January 31, 2011.

**Mr. Randolph's First Force-Placed Insurance Policy**

33.     Subsequently, on or about March 10, 2011, Nationstar purchased a one-year insurance policy with ASIC (Policy No. ALR07293994450), back dated to February 8, 2011, with an annual premium of $3,090.88, charged to Mr. Randolph's escrow account.  Exhibit 5.

On that same day, Nationstar mailed notice to Mr. Randolph which was the first notice given to Mr. Randolph of the purchase.

34.     The policy was issued despite the fact that a) Mr. Randolph already had hazard insurance for the term of the force-placed policy and b) ASIC, the issuer of the insurance policy, was the party responsible for making his insurance premium payment and had made the payment (albeit after the time that it was due).

35.     Additionally, the policy was backdated, despite the fact that there was no damage to the property or claims arising out of the property for period between February 8, 2011 and March 10, 2011.

36.     Notably, while the premium for the force-placed insurance policy was 50% greater than his prior premium, the force-placed policy provided substantially less coverage.  The only coverage on the ASIC policy was $205,000 on the dwelling.  Unlike Mr. Randolph's GeoVera policy, there was no coverage for personal property, other structures or loss of use under the ASIC policy.

37.     Nationstar immediately charged Mr. Randolph's escrow for the ASIC policy which caused a shortfall in his escrow account. To cover the shortage, Nationstar immediately increased the monthly payment it charged Mr. Randolph by $90/month.

38.     Nationstar claims it eventually cancelled Policy No. ALR07293994450, but no cancellation notice was ever sent to Mr. Randolph.  Even after supposedly cancelling the policy, refunding money to the escrow and despite the fact that he had insurance in place, defendants continued to make Mr. Randolph pay the increased monthly payment until November 2011.

39.     Inside of two months, ASIC made payments for two separate hazard policies for Mr. Randolph.  The first payment for the GeoVera policy was sent, albeit late, in January. ASIC

8

then purchased a second policy from itself which cost substantially more than the first for less coverage. This scenario clearly demonstrates the inherent conflict in the defendants' system.

**Mr. Randolph's Second Force-Placed Insurance Policy**

40.     On August 7, 2011, seven months after the incident, after Mr. Randolph retained counsel and after Mr. Randolph filed suit for his fire damages, ASIC issued a force-placed insurance policy for the property effective January 23, 2011 to January 23, 2012 (Policy ALR 07294324218). Nationstar and ASIC assert that Mr. Randolph's loss of January 24, 2011 was covered by Policy ALR 07294324218. *See* Exhibit 6.

41.     The only loss during this period occurred on January 24, 2011. However, defendant issued a policy that covered much more than just that date. Again, Nationstar and ASIC issued a policy for a period in which Mr. Randolph had existing coverage and for a period in which there had been no loss.

42.     Nationstar now claims that Policy ALR 07294324218 was effective only between January 23, 2011 and January 31, 2011. However, neither Nationstar nor ASIC has ever provided a copy of the declarations page indicating coverage to Mr. Randolph. Upon information and belief, the total cost for this eight day policy is $2,084.88.

43.     On August 25, 2010 ASIC issued yet another force-placed policy, this one Policy No. ALR07294370486. It also covered only the dwelling with limits of liability set at $205,000. The premium for this coverage was $3,127.28. *See* Exhibit 7.

44.     Defendants claim that because Mr. Randolph was eventually not charged for the force-placed policies he has no damages. This blatant attempt by the defendants to forestall liability, taken only after Mr. Randolph retained counsel and filed suit, does not address the

inherent conflict of interest in defendants' force-placed system and the unlawful practices which it still utilizes to the detriment and harm of Mr. Randolph and other similarly situated borrowers.

**Defendants**

45.     Defendant Nationstar, is a Delaware limited liability company with its principal place of business in Lewisville, Texas.  During the relevant time period, it served as the servicer of the loans of Plaintiff and the Class.

46.     Defendant ASIC, is a Delaware company with its principal place of business in Atlanta, Georgia and is a wholly owned subsidiary of Assurant, Inc. ("Assurant").

47.     In all of its actions described herein, ASIC acted on its own behalf and as the duly authorized agent of Nationstar.  Nationstar was contractually obligated to service the loans at issue pursuant to the terms of the mortgage contracts and hired ASIC to monitor all insurance compliance issues related to those mortgage contracts.

## FACTUAL ALLEGATIONS

**Defendants' Operations**

48.     Defendant Nationstar originates mortgage loans and acquires loans from other lenders. Each such loan is secured by a deed of trust on the underlying property.

49.     Upon information and belief, Nationstar has a significant indirect financial stake when a force-placed insurance policy is issued to one of its borrowers.

50.     Nationstar and ASIC have used the same adjuster and counsel in responding to the previous claims by Mr. Randolph.

**Force-placed Insurance**

51.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place insurance" when the

homeowner fails to maintain the insurance. This discretion afforded defendants to force place insurance is limited by the bounds of reasonable conduct. Defendants routinely exceed these bounds of reasonableness through the wrongful conduct described herein with respect to the force placement of insurance.

52.     The mortgage contract does not disclose that the lender or other servicer will receive a commission or reinsurance premium from force-placed insurance providers for purchasing the insurance from them. The mortgage contract also does not disclose that this payment will be based upon a percentage of the cost of the premium of the force-placed insurance. Instead, the contract misrepresents to borrowers that the cost of the force-placed insurance is necessary to protect the lender's interest in the secured property.

53.     The mortgage contract further does not disclose that the company charged with making the insurance premium payments from a borrower's escrow account is the same company that issues the force-placed policy if the insurance premium is not timely paid and coverage lapses.

54.     Borrowers are often unaware that the force-placed policy may cover only the loan amount, rather than the full value of the home. Because most force-placed insurance policies do not insure the contents of the property, the borrower could sustain a substantial loss if the home is damaged or destroyed. *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (November 10, 2010), available at: http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (referred to herein as "Ties to Insurers").

55.     These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage. Reportedly, such policies can cost as much as ten

times more than standard policies. While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower (or passed on to holders of mortgage-backed securities). *See Id*.

56.    Once a servicer receives evidence that a borrower has obtained his/her own insurance policy, the force-placed coverage is (or should be) fully or partially canceled. However, as shown by the example of Plaintiff Randolph, the financial benefit of force-placed insurance to the defendants far exceeds the benefit of accurately monitoring and maintaining their borrowers' existing coverage.  This conflict of interest on the part of the defendants is almost never decided to the benefit of the borrowers.

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

57.    The force-placing of insurance policies can be a very lucrative business for servicers. Mortgage servicers routinely receive paybacks and commissions from insurance companies for placing borrowers into force-placed insurance, totaling as much as 40% of the premiums paid by homeowners. Commonly, the servicer selects the provider in accordance with pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit. The servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through "reinsurance" premiums ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

58.    Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance

agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the paybacks or commissions collected from the force-placed insurance provider.

59.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy. For example, Assurant, the nation's largest provider of force-placed insurance and the sole owner of Defendant ASIC has admitted that its force-placed insurance division "writes[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Assurant, Inc., Annual Report (Form 10-K), at 81 (February 25, 2010).

60.     This is corroborated by Nationstar's own notices of March 10, 2011 and August 5, 2011 to Plaintiff Randolph.  In those letters, informing him for the first time of a force-placed policy being purchased, the company states: "Nationstar Mortgage or an affiliated company may receive compensation related to the placement of this policy." *See* Exhibits 5, 6 & 7.  While it does not specify the conflict, this is the first notice that a borrower receives demonstrating the conflict of interest in defendants' force-placed system.

61.     Borrowers have no opportunity to comparison-shop for force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

62.     For their part, servicers have no incentive to comparison shop for the best rate. Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

63.     In a case like Plaintiff Randolph's, this system would cause the borrower to pay 50% more for a policy that provided less coverage.  Worse, defendants made this payment despite having actual knowledge of the cheaper GeoVera policy that provided more coverage.

64.     Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant—the nation's largest provider of force-placed insurance policies and the parent company of American Security—states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are exclusive. *See* Assurant, Inc., Annual Report (Form 10-K), at 5 (February 23, 2011) ("The majority of our lender-placed agreements are exclusive.").

65.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, upon information and belief, servicers' contracts with force-placed insurance providers require or at least permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

66.     Nationstar has actually outsourced its processing to the force-placed insurance provider. Nominally, ASIC was to continuously monitor the servicer's mortgage portfolio and verify the existence of insurance on each mortgaged property.  Then, ostensibly, ASIC was charged with making timely insurance premium payments from a Borrowers' escrowed funds.

67.     In the event that borrowers do not maintain adequate insurance coverage, or, as with Mr. Randolph, if the provider fails in its responsibilities to make timely payments, the

provider issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Ties to Insurers, *supra*.

68. Servicers attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting. *See Id.*

69. Defendants receive commissions for force-placed policies at the expense of their customers, but with no risk to its own "investment."

70. Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

71. Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Nationstar requires borrowers to pay for unnecessary insurance coverage. Such examples include, without limitation: (a) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists for such period and (b) charging borrowers for force-placed insurance when there are already policies in effect.

**RESPA Prohibits Paybacks for Referrals and Fee-Splitting Related to Force-placed Insurance Policies**

72.     RESPA is the primary federal law regulating residential mortgage settlement services. HUD is charged with enforcing RESPA and has promulgated the implementing rules for RESPA. See Regulation X, 24 C.F.R. § 3500.

73.     RESPA was enacted, in part, to curb the problem of paybacks between real estate agents, lenders and other real estate settlement service providers. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result…in the elimination of kickback or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

74.     A key component of RESPA is its dual prohibition of referral fees and fee splitting between persons involved in real estate settlement services.

75.     The term "settlement service" is liberally defined in RESPA and Regulation X and includes the provision of services involving hazard, flood, or other casualty insurance. 24 C.F.R. § 3500.2(b). RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, payback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

76.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

77.     The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

78.     Force-placed insurance business referred to insurers by a lender or servicer constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a). Under RESPA, therefore, defendants are prohibited from accepting referral fees from force-placed insurance providers or from splitting insurance premiums with the insurer other than for services actually performed by the captive reinsurer.

79.     Further, with respect to the legitimacy of substantially similar captive reinsurance arrangements in the private mortgage insurance industry, HUD has clearly stated that consumers should be provided with adequate disclosure, finding that "consumers would be well served by a meaningful disclosure and a meaningful choice for consumers having their loans included in a captive reinsurance program." HUD defined a "meaningful disclosure" as one that "would reveal that the captive reinsurance arrangement exists, that the lender stands to gain financially under the arrangement, and that the consumer may choose not to have his or her insurance provided by

an insurer in such an arrangement." HUD defined a "meaningful choice" as one that "would provide the consumer an easy, non-burdensome opportunity to opt out by, for example, indicating a preference one way or the other on a form."

80.    Plaintiff contends that the same is true with respect to captive reinsurance arrangements relating to force-placed insurance. Defendants, however, failed to provide adequate disclosure and, further, failed to provide borrowers with any opportunity whatsoever to opt out of having his/her force-placed insurance policy provided by an insurer with whom defendants had a captive reinsurance arrangement.

**Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance**

81.    By retaining a commission or participating in a captive reinsurance arrangement, the servicer forces the borrower to pay for both the *actual* cost of the insurance policy and the cost of the payback. As the American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, *supra*. These costs are ultimately paid by the borrowers.

82.    Notably, Assurant's public filings indicate that approximately 40% of its force-placed insurance division's revenue is allocated to pay for "general expenses." This category includes commissions/referral fees paid to lenders and, further, in other lines of insurance, overhead and expenses are usually a much smaller fraction of policyholder claims. *See Id.*

83.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher — implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

84.     Thus, Nationstar's arrangement with ASIC tends to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding payouts to lenders. Amounts paid to servicers as sham reinsurance premiums and commissions have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such payouts—to the detriment of consumers.

85.     Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, *supra*.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class:

> a nationwide class consisting of all persons who were charged for a force-placed insurance policy placed on their property through Nationstar and/or ASIC and/or their affiliates or subsidiaries between October 1, 2009 and the present; and

87.     The Class excludes defendants and any entity in which defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

88.     The Class is so numerous that joinder of all members is impracticable.

89.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

90.     Plaintiff's claims are typical of the claims of the Class.

91.     There are questions of law and fact common to the Class, including but not limited to:

(a)     Whether the defendants' policies and procedures led to the likelihood that borrowers will be uninsured and require force-placed insurance;

(b)     Whether defendants had captive reinsurance arrangements with force-placed insurance providers and, if so, whether such arrangements involved sufficient transfer of risk and whether premiums ceded under such arrangements were *bona fide* compensation and solely for services actually performed;

(c)     Whether defendants received commission payments from force-placed insurance providers;

(d)     Whether defendants received payments from force-placed insurance providers that exceeded the value of any services actually performed;

(e)     Whether defendants wrongfully backdated force-placed insurance policies;

(f)     Whether defendants' conduct constituted an unfair trade practice;

(g)     Whether defendants violated their implied covenant of good faith and fair dealing;

(h)     Whether defendants' conduct was unconscionable;

(i)     Whether defendants have been unjustly enriched; and

(j)     Whether defendants are liable to plaintiff and the Class for damages and, if so, the measure of such damages.

92.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

93.     The defendants utilize a uniform national policy when force-placing insurance.

20

94.     The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by defendants.

95.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex Class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

96.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants.

97.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

98.     Class action status is also warranted under Rule 23(b)(2) because defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

99.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF RESPA, 12 U.S.C. § 2601 *et seq.*

100.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

101.    Throughout the Class Period, defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

102.    The amounts received by defendants through their arrangements with force-placed insurance providers constituted "things of value" within the meaning of RESPA §2602(2).

103.    Pursuant to pre-arranged commission agreements with force-placed insurance providers, defendants arranged to receive and did, in fact, receive commission payments from force-placed insurance providers. Upon information and belief, such commission payments were based upon a percentage of the premiums charged to borrowers for force-placed insurance coverage.

104.    Commission payments defendants accepted from force-placed insurance providers: (a) were not for services actually furnished or performed; and/or (b) exceeded the value of such services.

105.    Further, such amounts constituted fees, paybacks or things of value pursuant to agreements with force-placed insurance providers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers. Such practice violated RESPA, 12 U.S.C. 2607(a).

106.    Plaintiff and the Class members were, in fact, harmed by defendants' unlawful payback scheme and self-dealing.

107.    First, Plaintiff and the Class members were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful payback and/or fee-splitting schemes. Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. The plain, unambiguous language of RESPA section 8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there have been an overcharge. Plaintiff alleges that defendants have accepted unlawful payback payments and/or an unearned portion of settlement service charges in violation of RESPA— allegations and claims completely distinct and separate from whether the price they paid for settlement services was excessive.

108.    Second, though not necessary to prevail on their claims, plaintiff and the Class members were, in fact, overcharged for force-placed insurance. Congress has already determined that the *aggregate* effect of an unlawful payback/referral arrangement is to unnecessarily inflate the costs consumers pay for real estate settlement services and/or reduce competition among settlement service providers. 12 U.S.C. § 2601(b). ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result…in the elimination of paybacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."). Thus, paybacks and unearned fees unnecessarily and artificially inflate settlement service charges. Under defendants' scheme, the force-placed insurance premiums paid by Plaintiff and the Class necessarily and wrongly included payments for both: (a) actual

insurance services; and (b) payments unlawfully paid back to defendants' captive reinsurer that far exceeded the value of any services performed and, were also, in fact, illegal referral fees.

109.    Defendants therefore violated RESPA, 12 U.S.C. 2607. Pursuant to RESPA, 12 U.S.C. 2607(d), defendants are liable to plaintiff and the Class members in an amount equal to three times the amounts they have paid or will have paid for force-placed insurance as of the date of judgment.

110.    In accordance with RESPA, 12 U.S.C. 2607(d), plaintiff also seeks attorneys' fees and costs of suit.

## COUNT TWO

## BREACH OF CONTRACT

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

111.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

112.    Every contract contains an implied covenant of good faith and fair dealing.

113.    The mortgage contracts of plaintiff and the other Class members contained an implied covenant of good faith and fair dealing, pursuant to which defendants were bound to perform their obligations in good faith and to deal fairly with plaintiff and the other Class members.

114.    To the extent that the mortgage contracts of plaintiff and the Class members permitted defendants to unilaterally "force-place" insurance, defendants were obligated not to exercise their discretion to do so capriciously and in bad faith (for their own financial gain for the purposes of maximizing profits at borrowers' expense).

115.    Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a) Failed to make reasonable efforts to maintain borrowers' existing insurance policies and, instead through internal policies and procedures—which had the effect of maximizing their own profits—forced borrowers to pay for insurance policies from providers of defendants' choice. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b) Used their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the property and (ii) the cost of the commissions/reinsurance premiums defendants accepted from the force-placed insurance provider;

(c) Failed to seek competitive bids on the open market or otherwise make good faith efforts to reasonably exercise their discretion, and instead selected force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for defendants;

(d) Assessed excessive, unreasonable, and unnecessary insurance policy premiums against plaintiff and Class and misrepresented the reason for the cost of the policies;

(e) Collected a percentage of the force-placed premiums charged to plaintiff and the Class and did not pass that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(f) Accepted purported reinsurance premiums and/or commissions in return for placing borrowers with force-placed insurance providers, despite the fact that defendants actually incur, if any, expense because: (i) the force-placed insurance policies are automatically issued pursuant to pre-arranged agreements with providers; and/or (ii) defendants' captive reinsurance agreements provide for little or no actual transfer of risk;

(g) Backdated force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(h) Misrepresented in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time; and

(i) Failed to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

116.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, plaintiff and the other Class members have suffered damages.

117.    Plaintiff and the other Class members have been damaged as a direct and proximate result of defendants' breach and are entitled to damages.

## COUNT THREE

## BREACH OF CONTRACT

118.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

119.   Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

120.   To the extent that the mortgage contracts of plaintiff and the Class permitted defendants to unilaterally "force-place" insurance, defendants were contractually obligated to exercise their discretion to do so in a reasonable manner.

121.   Nonetheless, defendants have imposed or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay amounts for insurance coverage that exceed the amounts necessary to protect the mortgagee's interest in the secured property and (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during much of the lapse period for which the borrower is charged.

122.   Defendants have thus breached the mortgage contracts of plaintiff and the other Class members.

123.   Plaintiff and the other Class members have been damaged as a direct and proximate result of defendants' breach and are entitled to damages.

## COUNT FOUR

### UNJUST ENRICHMENT/DISGORGEMENT

124.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

125.   Plaintiff and the members of the Class have conferred a substantial benefit upon defendants for which the plaintiff has not been compensated. During the Class Period, defendants have wrongfully collected millions of dollars in purported commission payments and

reinsurance premiums and derived from the force-placed insurance premiums paid by plaintiff and the putative Class members.

126.    These payments were accepted and retained by defendants under circumstances such that it would be inequitable for defendants to retain the benefit without payment to plaintiff and the members of the Class.

127.    As a result of defendants' unjust enrichment, plaintiff and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

128.    Further, plaintiff and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by defendants as a result of their unfair, unlawful and/or deceptive practices.

## COUNT FIVE

## DECLARATORY AND INJUNCTIVE RELIEF

129.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

130.    On each cause of action stated above, plaintiff and the Class will be irreparably injured in the future by the defendants' misconduct.

131.    Plaintiff, on behalf of himself and all Class members, seeks a judgment declaring that defendants must cease the activities described herein, provide Class members with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance premiums and provide for adequate procedures and policies to ensure that defendants' unlawful conduct does not continue. Such policies and

procedures include, without limitation, that defendants: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the mortgaged property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) are prohibited from splitting fees, giving or accepting paybacks or referral fees, or accepting anything of value in relation to the purchase or placement of the force-placed insurance; (e) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (f) must purchase any force-placed insurance for a commercially reasonable price; and (g) are prohibited from backdating force-placed insurance policies absent evidence of damage to the property or claims arising out of the property during any lapse periods.

132.   Plaintiff and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the defendants' misconduct unless injunctive and declaratory relief is granted.

133.   By reason of the foregoing, plaintiff and the Class members are entitled to declaratory and injunctive relief as set forth herein.

## DEMAND FOR JURY TRIAL

134.   Plaintiffs hereby demand a trial by jury as to all claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against defendants and in favor of plaintiff and the Class and award the following relief:

a)      That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring plaintiff as representative of the Class and plaintiff's counsel as counsel for the Class;

b)      That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

c)      That the defendants be enjoined from continuing their unlawful practices;

d)      Statutory damages pursuant to RESPA §8(d)(2), 12 U.S.C. § 2607(d)(2);

e)      Compensatory, consequential, and general damages in an amount to be determined at trial;

f)      Costs and disbursements of the action;

g)      Restitution and/or disgorgement of defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

h)      Pre- and post-judgment interest;

i)      Reasonable attorneys' fees; and

j)      Such other and further relief as this Court may deem just and proper.


                    Respectfully submitted,

                    *COUHIG PARTNERS, LLC*


                    _____/s/Robert E. Couhig Jr._____
                    Robert E. Couhig, Jr. (La. Bar No. 4439)
                    Lisa L. Maher (La. Bar No. 21326)
                    Robert E. Couhig III (La. Bar No. 29811)
                    643 Magazine Street • Suite 300
                    New Orleans, Louisiana 70130
                    Telephone:    (504) 588-1288
                    Facsimile:    (504) 588-9750
                    *Attorneys for Plaintiff Elie Randolph*